**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JORGE MIRABAL and ALAN SCHOENBECK, individually, and on behalf of the NCR Savings Plan,<br>Plaintiffs,<br>v. | Civil Action No: 1:24-cv-00765-SCJ |
| NCR CORPORATION PLAN ADMINISTRATION COMMITTEE,<br>Defendant. | Hon. Steve C. Jones |

**BRIEF IN SUPPORT**
**<u>OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

I. Brief Overview ....................................................................................1

II. Supporting Facts ..................................................................................2

III. ERISA Provides for Plan-Wide Remedies ..................................................12

IV. Arguments in Support of Class Certification ...............................................14

A. Applicable Standards for Class Certification ...........................................15

B. Plaintiffs' Proposed Class is Ascertainable...........................................15

C. Numerosity ..........................................................................16

D. Commonality ........................................................................17

E. Typicality...........................................................................18

F. Adequacy ............................................................................19

G. Rule 23(b) is Satisfied ............................................................23

V. Conclusion..........................................................................................25

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 24

*Baird v. BlackRock Institutional Trust Co., N.A*,
No. 17-cv-01892, 2020 WL 7389772 (N.D. Cal. Feb. 11, 2020) ..... fn. 1, p. 2

*Beach v. JPMorgan Chase Bank, Nat'l Ass'n*,
No. 17-cv-563 (JMF), 2019 WL 2428631
(S.D.N.Y. June 11, 2019) ........ fn. 1, p. 2

*Carriuolo v. General Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ........ 17

*Cassell v. Vanderbilt Univ.*,
No. 3:16-cv-2086, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018) . fn. 1, p. 2

*Coan v. Kaufman*,
457 F.3d 250 (2d Cir. 2006) ........ 14

*Cox v. American Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) ........ 17

*Cunningham v. Cornell Univ.*,
No. 16-cv-6525 (PKC), 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) fn. 1, p. 2

*Falberg v. Goldman Sachs Group, Inc.*,
No. 19 Civ. 9910, 2022 WL 538146 (S.D.N.Y. Feb. 14, 2022) ....... fn. 1, p. 2

*Gamache v. Hogue*,
338 F.R.D. 275, 288–90 (M.D. Ga. 2021) ........ fn. 1, p. 21

*Herman v. NationsBank Trust Co.*,
126 F.3d 1354 (11th Cir. 1997) ........ 1

*Harmon v. Shell Oil Co.*,
No. 3:20-cv-00021, 2023 WL 5758889 (S.D. Tex. Sept. 6, 2023) ... fn. 1, p. 2

*Henderson v. Emory Univ.*,
No. 1:16-2920, 2018 WL 6332343
(N.D. Ga. Sept. 13, 2018) .......................................... fn. 1, p.1, 15-16, 18-19

*Huang v. TriNet HR III, Inc.*,
No. 8:20-cv-2293-VMC-TGW , 2022 WL 13631836 (M.D. Fla. Oct. 21, 2022) ........................................................................................ fn. 1, p. 1

*Hurtado v. Rainbow Disposal Co*,
No. 8:17-cv-01605-JLS-DFM , 2019 WL 1771797 (C.D. Cal. Apr. 22, 2019) ........................................................................................ fn. 1, p. 1

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
317 F.R.D. 675 (N.D. Ga. 2016) ..........................................................16, 20

*In re Schering-Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009) .......................................................2, 18, 23, 25

*In re SunTrust Banks, Inc. ERISA Litig.*,
No. 1:08-03384, 2016 WL 4377131
(N.D. Ga. Aug. 17, 2016) ................................................. fn. 1, p. 1, 2, 3, 23

*In re Wells Real Estate Investment Trust, Inc. Securities Litigation*,
No. 1:07-862, 2009 WL 10688777 (N.D. Ga. Sept. 16, 2009) ....... fn. 2, p. 21

*Kornberg v. Carnival Cruise Lines, Inc.*,
741 F.2d 1332 (11th Cir. 1984) .................................................................18

*Krueger v. Ameriprise Financial, Inc.*,
304 F.R.D. 559 (D. Minn. 2014) ..................................................... 18, 24-25

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
552 U.S. 248 (2008).....................................................................................12

*Little v. T-Mobile USA, Inc.*,
691 F.3d 1302 (11th Cir. 2012) .................................................................15

*Monroe County Employees' Retirement System v. Southern Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ....................................................................14

*Mattson v. Milliman, Inc.*,
697 F. Supp.3d 1109 (W.D. Wash. 2023) ......................................... fn. 1, p. 1

*Piazza v. Ebsco Industries, Inc.*,
273 F.3d 1341 (11th Cir. 2001) ..................................................15, 18, 19, 25

*Pizarro v. Home Depot, Inc.*,
No. 18-01566, 2020 WL 6939810 (N.D. Ga. Sept. 21, 2020) .... fn. 1, 2, 3, 16

*Shanehchian v. Macy's, Inc.*,
No. 07-828, 2011 WL 883659 (S.D. Ohio Mar. 10, 2011) ...........................25

*Smith v. Bayer Corp.*,
521 U.S. 591 (1997)...........................................................................................25

*Surowitz v. Hilton Hotels Corp.*,
383 U.S. 363, 368–69 (1966) ........................................................ fn. 1, p. 20

*Tracey v. Massachusetts Institute of Technology*,
No. 16-11620-NMG , 2018 WL 5114167 (D. Mass. Oct. 19, 2018) fn. 1, p. 2

*Tussey v. ABB, Inc.*,
521 U.S. 591 (1997).............................................................................................4

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
521 U.S. 591 (1997)........................................................................... 19-20

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) .........................................................................17

*Vellali v. Yale Univ.*,
2019 WL 5204456 (D. Conn. Sept. 24, 2019).................................. fn. 1, p. 2

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................18

*Williams v. Mohawk Industries, Inc.*,
568 F.3d 1350 (11th Cir. 2009) .......................................................... 17

## I. **<u>BRIEF OVERVIEW</u>.**

Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) on behalf of the NCR Savings Plan ("the Plan") and its participants. Plaintiffs contend that Defendant, as a fiduciary of the NCR Savings Plan ("Plan"), breached its duties by causing the Plan to pay excessive recordkeeping fees, resulting in millions of dollars in losses to the Plan. ERISA imposes on plan fiduciaries "the highest [duties] known to law." *Herman v. NationsBank Tr. Co*., 126 F.3d 1354, 1361 (11th Cir. 1997). Defendant owed Plan participants a duty of prudence. Defendant violated that duty. Instead of prudently safeguarding participants' assets, Defendant caused the Plan to pay Fidelity compensation for recordkeeping—precisely the kind of imprudent conduct ERISA forbids.

Plaintiffs move to certify their claims as a class action under Federal Rule of Civil Procedure 23(b)(1). They propose the following class definition: "All persons who were participants in or beneficiaries of the NCR Savings Plan from December 13, 2016, through the present." This definition tracks those approved in numerous ERISA fiduciary-breach cases involving 401(k) plans—cases just like this one—certified in this Circuit and nationwide.[1]

[1] *See, e.g., Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343 (N.D. Ga. Sept. 13, 2018); *Pizarro v. The Home Depot, Inc.*, No. 1:13-cv-01566-WMR, 2020 WL 6939810 (N.D. Ga. Sept. 21, 2020); *In re SunTrust Banks, Inc.*, No. 1:08-cv-03384-RWS, 2016 WL 4377131 (N.D. Ga. Aug. 17, 2016); *Huang v. TriNet HR III, Inc.*, No. 8:20-cv-2293-VMC-TGW, 2022 WL 13631836 (M.D. Fla.

Courts have long recognized such claims as textbook candidates for class certification. As the court held in *In re SunTrust Banks, Inc. ERISA Litig*., "fiduciary breach claims are paradigmatic examples of claims appropriate for certification under Rule 23(b)(1)." 2016 WL 4377131, at *8 (N.D. Ga. Aug. 17, 2016) (quoting *In re Schering-Plough Corp. ERISA Litig*., 589 F.3d 585, 604 (3d Cir. 2009)). Likewise, in *Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566-WMR, 2020 WL 6939810 (N.D. Ga. Sept. 21, 2020), the court certified a nationwide class of more than 300,000 participants in an ERISA case alleging a breach of the fiduciary duty of prudence involving Home Depot's 401(k) plan.

---

Oct. 21, 2022); *Mattson v. Milliman, Inc*., 697 F. Supp.3d 1109 (W.D. Wash. 2023); *see also Harmon v. Shell Oil Co*., No. 3:20-cv-00021, 2023 WL 5758889 (S.D. Tex. Sept. 6, 2023); *Falberg v. Goldman Sachs Grp., Inc*., No. 19 Civ. 9910, 2022 WL 538146 (S.D.N.Y. Feb. 14, 2022), *leave to appeal denied sub nom. Goldman Sachs 401(k) Plan Ret. Comm. v. Falberg*, 2022 WL 4126112 (2d Cir. June 29, 2022); *Baird v. Blackrock Inst. Tr. Co., N.A*., No. 17-cv-01892, 2020 WL 7389772 (N.D. Cal. Feb. 11, 2020); *Vellali v. Yale Univ.*, No. 3:16-cv-1345(AWT), 2019 WL 5204456 (D. Conn. Sept. 24, 2019); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019), *reconsideration denied*, 2021 WL 964417 (S.D.N.Y. Mar. 15, 2021); *Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 17-cv-563 (JMF), 2019 WL 2428631 (S.D.N.Y. June 11, 2019); *Hurtado v. Rainbow Disposal Co*., No. 8:17-cv-01605-JLS-DFM, 2019 WL 1771797 (C.D. Cal. Apr. 22, 2019); *Cassell v. Vanderbilt Univ*., No. 3:16-cv-2086, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018); *Tracey v. MIT*, No. 16-11620-NMG, 2018 WL 5114167 (D. Mass. Oct. 19, 2018).

No principled reason exists for a different outcome here. This Court should follow the decisions from *In re SunTrust Banks*, *Pizarro*, as well as the legions of other cases certifying classes in ERISA cases just like this, and grant this Motion.

## II. SUPPORTING FACTS.

**Overview of the Plan:** The NCR Savings Plan (the Plan) is a defined contribution plan established on May 1, 1985, by NCR Corporation. (Ex. F, 2021 Form 5500, p. 37.) The Plan is designed to qualify as a profit-sharing plan with a qualified cash or deferred arrangement under Section 401(k) of the Internal Revenue Code of 1986, as amended. (*Id.*) The Plan is subject to the provisions of ERISA. (*Id.*)

As the Plan administrator, Defendant is a statutory fiduciary to the Plan. (ECF No. 1, Complaint ("Complaint"), ¶ 17; Answer, ¶ 17.) As of December 31, 2021, the middle of the class period, the Plan had nearly $2.1 billion in assets. (Ex. F, 2021 Form 5500, p. 35.) The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1). (Complaint, ¶ 16; Answer, ¶ 17 .)

Effective October 16, 2023, NCR Corporation changed its name to NCR Voyix Corporation, marking its separation into two independent, publicly traded companies: NCR Voyix and NCR Atleos. (ECF No. 8, fn. 1.) That same year, NCR sold its digital-banking business to an affiliate of Veritas Capital Fund VIII, L.P., completing the spin-off. In 2024, that spin-off gave rise to the NCR Atleos Savings Plan. (Exs. I-J, 2024 Form 5500s for NCR Voyix Savings Plan and NCR Atleos

Savings Plan.) After the spin-off, the NCR Savings Plan was renamed the NCR Voyix Savings Plan. Because that change occurred after this lawsuit was filed, this brief continues to refer to it as 'the Plan' for consistency.

**Fidelity Received Excessive Compensation:** Fidelity Investments Institutional Operations Co., LLC ("Fidelity"), has been the Plan's recordkeeper for the entire class period. (Complaint ¶ 43.) According to Plaintiff's expert, Ty Minnich, one of the country's foremost experts on recordkeeping, had Defendant acted as a prudent fiduciary, participants would have paid no more than $30 per participant annually for recordkeeping. Instead, Defendant allowed Fidelity to overcharge the Plan by more than $2.2 million, causing at least $2.7 million in compounded losses through 2024. (Exhibit K, Minnich Report, pp. 21-22.)

Additionally, it is worth nothing that in 2023, the first year after the original Complaint was filed (Case No. 1:22-cv-04879), NCR reported in its Form 5500 that Fidelity's direct compensation for recordkeeping was reduced to $340,401, a nearly 50% reduction from the 2022 amount reported. (*Compare* Ex H. p. 10, Schedule C(2)(d) reporting Fidelity's direct compensation as $340,401 *with* Ex. G, p. 10, Schedule C(2)(d) reporting Fidelity's direct compensation as $689,002.)

It is well established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees are reasonable. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Excessive expenses "decrease [an

account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." (Complaint, ¶ 61.)

In this case, Defendant failed to prudently manage and control the compensation Fidelity received from the Plan. (*Id*. ¶¶ 52–110.) For example, as explained in Plaintiff's expert witness report, Defendant never analyzed the total compensation Fidelity collected for its recordkeeping services. (Minnich Report, p. 4.) Instead of monitoring those fees, Defendant handed that duty to its advisors—allowing Fidelity to siphon excessive compensation unchecked. (*Id*.) Defendant let Fidelity set its own pay rather than negotiating on behalf of participants. (*Id*. at 5.) It failed to ensure that Fidelity's recordkeeping fees were reasonable and neglected to monitor Fidelity's compensation altogether. (*Id*.) Defendant also ignored the need to test the market by soliciting competitive bids for recordkeeping services through a request for proposal since 2015. (*Id*.)

The 2015 RFP demonstrated the benefits of true competition among Aon Hewitt, Xerox, and Fidelity. (Minnich Report, p. 5.) Fidelity ultimately won the bid and entered a new five-year contract for Plan recordkeeping. (*Id*.) As part of that agreement, Fidelity reduced its pricing. (*Id*.) Before the RFP, Fidelity's per-participant fee was $64 (before removing trustee fees). (*Id*.) After the RFP, that fee dropped first to $49, and then to $45 per participant. (*Id*.)

Despite the results of the 2015 RFP, Defendant never conducted another RFP during the class period. (*Id.*) Defendant also ignored clear warnings. A November 28, 2017, presentation from Morgan Lewis attorney Rosina B. Barker to the NCR Plan Administration Committee showed that companies were facing lawsuits over excessive recordkeeping fees. (*Id.*) That information should have prompted Defendant to issue a new RFP, but it failed to act. (*Id.*) So should information from the Department of Labor ("DOL"). The DOL advises that RFPs be conducted periodically. Defendant conducted none during the class period. (*Id.*) This continued inaction further underscores Defendant's fiduciary imprudence and lack of oversight. (*Id.*)

In October 2019, Hager Strategic completed a Fee Benchmarking Summary for Fidelity's Benefits Administration Services, reviewing fees for NCR's DB, DC, and H&W plan administration. (Minnich Report, p. 5.) Fidelity responded with a five-year renewal proposal offering revised pricing effective January 2020 through 2024. (*Id.* at 6.) The proposal listed a 2018 base recordkeeping fee of $45 per participant per year, a proposed 2020 base fee of $45, and a 2020 base fee of $42 for participants in Fidelity Managed Accounts. (*Id.*) This benchmarking exercise amounted to little more than a paper review—limited blind data, no competitive process, and Fidelity as the only participant. (*Id.*) The data itself showed that comparable plans paid as little as $29 per participant for 13,170 participants. (*Id.*)

That evidence should have spurred Defendant to conduct a competitive RFP. Instead, it accepted Fidelity's proposal without scrutiny. (*Id.*) The record confirms that Defendant adopted the benchmark with minimal investigation, deferring to its advisors—and even to Hager—rather than exercising its own fiduciary judgment. (*Id.*)

Beyond its failure to conduct an RFP during the class period, Defendant's own records fail to disclose accurately how much Fidelity received from the Plan in direct and indirect compensation. (Minnich Report, p. 5.) The direct compensation Defendant caused the Plan to pay Fidelity for recordkeeping was excessive by any measure. (*Id.* at 6.) As an example, the Plan fee disclosure dated December 9, 2019, states that Plan participants pay a total of $56.00 annually for recordkeeping and administrative services. (*Id.*) $45.00 of the $56.00 is described as a "recordkeeping fee" and $11.00 of which is for "other administrative fees." (*Id.*) The $45.00 "recordkeeping fee" standing alone is excessive for this Plan for the services performed by Fidelity. (*Id.*) When the $45.00 is added to the $11.00 "administrative fees," the $56.00 in direct compensation that Defendant caused the Plan to pay for recordkeeping and administrative services becomes more excessive. (*Id.*) Notably, even Defendant's corporate representative, Douglas Stover, referred to this fee as "fungible" in an email exchange he had with another Plan fiduciary (*see* Ex. S).

Thus, Defendant's corporate representative conceded in writing that the $11 "admin fee" was a fungible amount and part of Fidelity's compensation for recordkeeping.

Based on the amounts disclosed by Defendant in the Plan's 5500 – Schedule C disclosures from 2017 to 2022, Fidelity received at least the following direct compensation from the Plan (*see* Exs. A-H, Schedule C, Section 2(d)): $773,188 for 2017 with 13,227 Plan participants, equivalent to $58.45 per participant annually; $715,724 for 2018 with 13,085 Plan participants, equivalent to $54.69 per participant annually; $697,244 for 2019 with 14,110 Plan participants, equivalent to $49.42 annually; $858,310 for 2020 with 14,829 Plan participants, equivalent to $57.88 per participant annually; $947,098 for 2021 with 16,337 Plan participants, equivalent to $57.97 per participant annually; $863,634 for 2022 with 15,757 Plan participants, equivalent to $54.81 per participant annually.

However, the 408(b)(2) disclosures to Plan participants reported the following annual recordkeeping fees: 2017 – $45 per participant (Ex. M, p. 2); 2018 – $45 per participant (Ex. N, p. 2); 2019 – $45 per participant (Ex. O, p. 2); 2020 – $42 per participant (Ex. P, p. 2); 2021 – $42 per participant (Ex. Q, p. 2); and 2022 – $42 per participant (Ex. R, p. 2). (See also Minnich Report, p. 8.)

Yet Schedule C of the Plan's Form 5500s shows that Fidelity received not only this direct compensation, but also substantial additional amounts through indirect compensation for its recordkeeping services. (See Exs. A–H, Schedule C,

Section 2(e).) Those indirect payments were never disclosed. (Id.) The Plan's Form 5500s, signed and filed under penalty of perjury by Defendant—make clear that during the class period, Fidelity's total direct compensation from the Plan exceeded what Defendant reported to participants in the required 408(b)(2) disclosures. (Minnich Report, p. 8.)

In sum, had Defendant acted as a prudent fiduciary, participants would have paid no more than $30 per year for recordkeeping. (Minnich Report, p. 21.) Instead, Defendant allowed Fidelity to overcharge the Plan by over $2.2 million, producing at least $2.7 million in compounded losses. (*Id*.) The Plan will continue to suffer these losses, and retirement assets will be squandered unless prudent remedial measures are implemented, and soon.

**Deposition Testimony and Documentary Evidence Confirms Defendant's Fiduciary Breaches:** Defendant's corporate representative, Douglas N. Stover, who served on NCR's Retirement Plan Committee for much of the class period, was deposed on August 12, 2025. A copy of his deposition transcript is attached as Exhibit L.

By Mr. Stover's own account, the Committee relied heavily on third-party advisors—including Hager Strategic—for advice and analysis, although Hager itself was not a fiduciary. "I do not think that they were a fiduciary." (Stover Tr., 65:22.) Stover described the Committee's complete reliance on Hager Strategic to evaluate

Fidelity's fees, rather than performing its own independent review: "Hager Strategic performed that function and told us that the number that Fidelity was offering was reasonable and appropriate for companies that we competed with." (Stover Tr., 61:23–62:1.) Instead of performing its own review of Plan costs for recordkeeping, the Committee simply accepted Hager's conclusions that Fidelity's recordkeeping compensation was "reasonable." This was not fiduciary oversight. It was rubber-stamp rubber-stamp approval of non-fiduciary advice.

Mr. Stover further confirmed that to his knowledge NCR never conducted a request for proposal for recordkeeping services during the class period (2016 to the present). (Stover Tr. 13:23-14:4.) Instead, just as NCR has done throughout this litigation, Mr. Stover pointed to an antiquated RFP conducted ten years ago, in 2015. (*Id.*) What NCR called a "Request for Information" during the class period was not a search for competing bids; it was a paper exercise handled internally by Hager Strategic. As Mr. Stover conceded, the RFI or "price check" was handled by Hager Strategic, who prepared a benchmarking report rather than soliciting competitive bids for recordkeeping services. (Stover Tr., 91:2-21.) No RFI was ever sent to recordkeepers such as Empower, Schwab, or Merrill Lynch to request pricing or service proposals for the Plan. (Stover Tr., 91:13-21.) In other words, the Committee never invited proposals from other recordkeepers such as Empower or Schwab. It relied entirely on Hager's internal data, and accepted its word that Fidelity's fees

were appropriate. Mr. Stover admitted the Committee's fee comparisons were based on "marketing data from periodicals," "mergers and acquisitions," and "our consultant who did the database and price check," not on live market competition. (Stover Tr., 64:8–10.)

When Mr. Stover joined the Committee in 2014, he received only limited general ERISA training from outside counsel. (Stover Tr., 18:9–25; 20:1–13.) He testified that the training addressed "roles and responsibilities and duties under ERISA and fiduciary responsibility," but was unable during his deposition to provide testimony on what concrete instructions he received as to how to evaluate or control plan fees. (*Id.*) Mr. Stover conceded the Committee failed to adopt or follow any written procedures beyond what appeared in its charter. "I am not sure there's anything beyond what is in the charter for the committee that outlines the duties and responsibility." (Stover Tr., 22:11–22:15.) He also admitted that neither he nor other Committee members received specific instruction "on how to ensure that recordkeeping fees were reasonable." (Stover Tr. 22:1–10.) When asked whether he received training on monitoring recordkeeping expenses, he answered yes—but clarified that the only "commentary was to be responsible for reasonable fees on behalf of the participant[s]." (Stover Tr. 19:25–20:6.) He further confirmed that he was given no instruction on how to ensure fees were reasonable and no instruction on how to exercise "prudent behavior." (Stover Tr. 20:4–13.)

Although online modules through Thompson Hine were later made available, Mr. Stover could not recall how often he completed them or whether the other members did. (Stover Tr., 21:10–22.) This limited and superficial training left the Committee unequipped to perform its fiduciary duties. NCR entrusted billions of dollars in employee retirement assets to fiduciaries who lacked meaningful training on how to evaluate plan fees. The result was predictable: blind reliance on consultants and recordkeepers whose interests were adverse to the Plan. Taken together, Mr. Stover's testimony reveals a pattern of abdication. The Committee deferred to non-fiduciary vendors, failed to negotiate fees, received cursory training, and ignored red flags. These are not isolated lapses; they are systemic failures of fiduciary governance.

ERISA demands prudence, loyalty, and independent judgment. NCR's fiduciaries delivered none of these. Their inaction allowed outside vendors to dictate the plan's costs, siphoning participants' retirement savings to for-profit service providers. The evidence shows a Committee that existed in name only—one that let the fox guard the henhouse while employees paid the price.

## III. <u>ERISA PROVIDES FOR PLAN-WIDE REMEDIES</u>.

In ERISA, Congress established a cause of action exclusively for plan relief, not individual relief. *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 256 (2008); *see* 29 U.S.C. §§ 1109(a), 1132(a)(2) [ERISA §§ 409(a), 502(a)(2)].

Congress authorized certain classes of plaintiffs—the Secretary of Labor, a plan participant, or a plan fiduciary—to bring a civil action "for appropriate relief under section 1109," which is exclusively plan relief. 29 U.S.C. § 1132(a)(2).

First, a fiduciary who breaches its duty is liable for "any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a) (emphasis added). Second, the breaching fiduciary is liable "to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." *Id*. (emphasis added). Third, the fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary," *i.e.*, equitable relief necessarily affecting the plan. *Id*. Given ERISA's focus on plan remedies, the plaintiff in a fiduciary breach action brings suit "in a representative capacity on behalf of the plan as a whole." *Russell Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985).

The statute's plain text makes clear that upon a finding of breach, the fiduciary is liable for the full amount of plan losses, regardless of class certification. The errant fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a) (emphasis added). Nothing in ERISA requires class certification, or the use of any other procedural device, to obtain plan-wide recovery. Because the statute grants plan participants a substantive right to recover all of their plan's losses, a grant of class certification is not

technically required to obtain that relief. Nor can a denial of certification curtail a participant's substantive right to recover the full measure of plan losses. *See* 28 U.S.C. § 2072(b) (procedural "rules shall not abridge, enlarge or modify any substantive right").

Nevertheless, courts across the country have recognized that it is appropriate and beneficial in an ERISA breach of fiduciary duty action to "employ procedures to protect effectively the interests" of other plan participants, usually through class certification. *Coan v. Kaufman*, 457 F.3d 250, 259–62 (2d Cir. 2006). Among other things, certification enhances due process by ensuring that the absent plan participants' interests will be fairly and adequately represented by similarly situated individuals and experienced counsel. *See* Fed. R. Civ. P. 23(a)(3)–(4); Fed. R. Civ. P. 23(g). As shown next, this suit meets the Rule 23 criteria.

## IV. ARGUMENTS IN SUPPORT OF CLASS CERTIFICATION.

### A. Applicable Standards for Class Certification.

"The district court has broad discretion in determining whether to certify a class." *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 377 (N.D. Ga. 2019.) "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citation omitted). "If the plaintiff's proposed class is adequately

defined and clearly ascertainable, the plaintiff must then establish the four requirements listed in Federal Rule of Civil Procedure 23(a)" and "at least one of the three requirements listed in Rule 23(b)." *Id.*; *see also Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343, at *3 (N.D. Ga. Sept. 13, 2018).

Rule 23(a) requires Plaintiffs to establish that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).

Here, Plaintiffs seek certification under Rule 23(b)(1), which requires a showing that "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed. R. Civ. P. 23(b)(1).

**B. <u>Plaintiffs' Proposed Class is Ascertainable</u>.**

"[C]ourts have universally recognized that the first essential ingredient to class treatment is the ascertainability of the class." *In re Delta/AirTran Baggage Fee Antitrust Litig*., 317 F.R.D. 675, 679 (N.D. Ga. 2016).

Defendant cannot dispute that the proposed Class is ascertainable. The criteria in Plaintiffs' proposed class definition "is objective and the identification of its members is administratively feasible via the Plans' participant account records." *Henderson*, 2018 WL 6332343, at *4. The Plan participants who meet the class definition can be readily determined from the records of the Plan, *Pizarro*, 2020 WL 6939810 at *4, as well as from the Plan's recordkeeper. Accordingly, the Court should find that the proposed class is readily ascertainable.

**C. <u>Numerosity</u>.**

Plaintiffs have submitted evidence showing that the Class includes more than 15,000 members. (*See* Exs. A–H, p. 2, Section 6(g), listing total participants with account balances at the end of each Plan year.) With more than 15,000 Plan participants, the Class easily surpasses the forty-member threshold. Defendant, therefore, cannot seriously dispute numerosity. Courts weigh several factors in deciding whether joinder is practicable, including: the size of the class, the nature of the action, the value of each member's claim, and their geographic dispersion. *Henderson*, 2018 WL 6332343, at *4. "While there is no fixed numerosity rule,"

classes with more than forty members generally satisfy numerosity. *Cox v. Am. Cast Iron Pipe Co*., 784 F.2d 1546, 1553 (11th Cir. 1986). Plaintiffs have plainly met this requirement.

**D. Commonality.**

Rule 23(a)(2) requires the plaintiffs to show that "there are questions of law or fact that are common to the class." To satisfy commonality, the claims must depend on a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Carriuolo v. Gen. Motors Co*., 823 F.3d 977, 984 (11th Cir. 2016) (citations omitted). Importantly, unlike Rule 23(b)(3)—which is not relevant to Plaintiffs' class certification motion—Rule 23(a)(2) does not require common questions of fact or law to predominate over individual ones. *Vega v. T–Mobile USA, Inc*., 564 F.3d 1256, 1268 (11th Cir. 2009). Instead, "even a single common question will do." *Carriuolo*, 823 F.3d at 984. This is a low hurdle to overcome. *Williams v. Mohawk Indus., Inc*., 568 F.3d 1350, 1356 (11th Cir. 2009). Because an ERISA fiduciary breach action is an action on behalf of a plan regarding duties owed at the plan level, "commonality is quite likely to be satisfied." *In re Schering-Plough Corp. ERISA Litig.,* 589 F.3d 585, 599 fn. 11 (3d Cir. 2009).

Here, Plaintiffs' claims present a number of questions common to the proposed class. These include: (1) whether Defendant is a fiduciary to the Plan; (2) whether Defendant breached its fiduciary duties; (3) whether the Plan suffered losses; (4) how to calculate those losses; and (5) what relief is appropriate. These questions are capable of class-wide resolution, as other courts have found. *Henderson*, 2018 WL 6332343 at *4–5; *see also Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559, 572 (D. Minn. 2014). That there are multiple common questions that could be resolved in a single stroke is more than enough for Plaintiffs to meet their low hurdle for commonality under Rule 23(a)(2). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (stating that "even a single common question will do") (citations omitted). Commonality is satisfied.

**E. <u>Typicality</u>.**

Turning next to typicality, Plaintiffs need only show that their claims "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). While related to the commonality requirement, typicality focuses on "the individual characteristics of the named plaintiff in relation to the class." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001). A plaintiff's claim is typical if there is a "nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Because a §1132(a)(2) claim is inherently a representative

claim, any participant's claim is necessarily typical of the claims of the class, since any participant is asserting the Plan's claim. For these reasons, courts routinely find any participant's fiduciary breach claims to be typical of the claims of all participants in the plan. *Piazza*, 273 F.3d at 1351 (finding typicality because ERISA fiduciary breach claims on behalf of a plan "arise from precisely the same practice and the legal issues are identical").

Plaintiffs have satisfied the typicality requirement. Their claim, brought in a representative capacity on behalf of the Plan, rests on the same conduct and legal theory as the class claims: Defendant's breach of its fiduciary duty of prudence in causing the Plan to overpay Fidelity for its recordkeeping. *Henderson*, 2018 WL 6332343, at *5–6. The proof will focus on Defendant's misconduct and the resulting harm, which are common to all class members, not individual circumstances. *Id*. Typicality is, therefore, established.

**F. Adequacy.**

For the final requirement of Rule 23(a), Plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two areas for which the plaintiffs must demonstrate adequacy. First, the plaintiffs must show that they and their counsel "will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir.

2003). Second, the plaintiffs must show that no "substantial conflicts of interest exist between the representatives and the class." *Id*. Plaintiffs have established both.

Both Plaintiffs and their counsel have and will continue to adequately represent the class. In terms of Plaintiffs Jorge Mirabal's and Alan Schoenbeck's individual roles thus far, both have already assisted with the discovery process, reviewed and approved critical documents in this case, have been readily available to answer questions, completed Defendant's extensive written discovery requests, and been deposed in person by Defendant's counsel. (Ex. T, Mirabal Decl. ¶ 6; Ex. U, Schoenbeck Decl. ¶ 6.) They are both excellent potential class representatives.

As demonstrated by their attached sworn Declarations (Exs. T and U), Plaintiffs' interests are aligned with the class members' interests because they are acting on behalf of the Plan in seeking to enforce the fiduciary duties that Defendant owed to the Plan and to recover monetary losses and equitable relief due to the Plan. *See* 29 U.S.C. §1109(a). Because Plaintiffs are pursuing claims on behalf of the Plan, there are no conflicts between Plaintiffs' individual interests and the interests of the class. To the contrary, Plaintiffs and all class members share the same objectives, share the same factual and legal positions, and share the same interest in establishing Defendant's liability. *See In re Delta/AirTran Baggage Fee Antitrust Litigation*, 317 F.R.D. 675, 680 (N.D. Ga. 2016). Additionally, there is no dispute that both

Plaintiffs paid recordkeeping fees and that they have alleged their individual accounts suffered losses because they were charged excessive fees.

Additionally, a class representative needs only a basic understanding of the claims and a willingness to participate in the case.[2] Accordingly, "[t]here is no requirement under *Kirkpatrick* that the lead plaintiff must possess expert knowledge of the details of the case," and plaintiffs are expected to rely on counsel for guidance. *In re Wells Real Est. Inv. Tr., Inc. Sec. Litig*., No. 1:07-CV-862-CAP, 2009 WL 10688777, at *5 (N.D. Ga. Sept. 16, 2009). As demonstrated by Plaintiffs' attached sworn declarations, they satisfy all Rule 23(a) adequacy requirements.

Rule 23(g) also provides factors for the Court to assess in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g). Plaintiffs' counsel easily satisfy each factor.

Plaintiffs' lead counsel, Michael McKay, has substantial experience in prosecuting ERISA fiduciary breach class actions such as this and together with co-

---

[2] *See Surowitz v. Hilton Hotels Corp*., 383 U.S. 363, 368-369 (1966); *see also Gamache v. Hogue*, 338 F.R.D. 275, 288-290 (M.D. Ga. 2021); *In re Wells Real Est. Inv. Tr., Inc. Sec. Litig*., No. 1:07-CV-862-CAP, 2009 WL 10688777, at *5 (N.D. Ga. Sept. 16, 2009).

counsel in this case will fairly and adequately represent the interests of the Plan. (McKay Decl., Ex. V.) Mr. McKay has brought and settled similar claims against the University of Chicago, Brown University, University of Miami, Princeton University, and Washington University of St. Louis. (*Id.* ¶ 4.) Mr. McKay has recovered over $100 million in ERISA breach of fiduciary duty class actions for his clients over the past ten years. (*Id.*)

In addition to Mr. McKay, each member of Plaintiffs' counsel brings extensive class action and federal court experience to this case. Mr. Cabassa is Board Certified in Employment Law by the Florida Bar (Cabassa Decl., Ex. X, ¶¶ 2-5), and Mr. Hill has litigated roughly 600 federal cases in the Middle District of Florida alone. (Hill Decl., Ex. W, ¶¶ 5-6.) Together, they have been appointed class counsel in approximately 50 to 60 class actions, or more. (*Id.*) Ms. Heystek supports both Messrs. Cabassa and Hill with class action work and also has extensive experience qualifying her to serve as class counsel. (Heystek Decl., Ex. Y, ¶¶ 5-9.)

Likewise, Mr. Edelman has been a member of the Florida Bar since 1996 and has practiced law for more than 25 years, focusing primarily on labor and employment matters. (Edelman Decl., Ex. Z, ¶¶ 5-9.) His sworn declaration details his qualifications and substantial class action experience. Plaintiffs' counsel's law firms have both the capability and resources to serve as class counsel.

In accordance with their extensive experience, Plaintiffs' counsel retained an industry expert whose report is filed as Exhibit K to this Motion. They filed this case nearly three years ago (Case No. 1:22-cv-04879-SCJ), pursued and completed the administrative process Defendant demanded, defeated a potentially dispositive motion to dismiss (in part), and conducted extensive discovery—including third-party discovery from the Plan's recordkeeper, Fidelity. (Hill Decl., Ex. W, ¶¶ 10-11.) Plaintiffs' counsel also took multiple depositions of Plan fiduciaries, traveled to Miami to defend the deposition of Mr. Mirabal, and defended Mr. Schoenbeck's deposition in Tampa. (*Id.*) Throughout, they have diligently advanced the claims and achieved meaningful progress. (*Id.*) Plaintiffs' counsel have demonstrated both a high level of competence and commitment to this litigation. *(Id.*) They are aware of no actual or potential conflicts. (*Id.*) The adequacy requirement is met.

**G. Rule 23(b) is Satisfied.**

Courts in ERISA fiduciary breach cases have consistently recognized §1132(a)(2) claims as "paradigmatic" Rule 23(b)(1) class actions. *In re Suntrust Banks*, 2016 WL 4377131, *26 (quoting *Schering*, 589 F.3d at 604, collecting cases). Certification under Rule 23(b)(1) is appropriate if "prosecuting separate actions by or against individual class members would create a risk of":

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Rule 23(b)(1)(A) "takes in cases where the [defendant] is obligated by law to treat the members of the class alike" or "must treat all alike as a matter of practical necessity." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citation omitted). Here, Defendant owes fiduciary duties to the Plan, and thus to all participants, and hence all class members. *See* 29 U.S.C. § 1104(a)(1). In discharging those duties, Defendant was obligated to treat all participants (and all class members) alike. Allowing thousands of individuals to pursue separate actions on behalf of the Plan could result in varying adjudications on numerous issues, resulting in conflicting and incompatible standards of conduct for Defendant. As noted, to resolve Plaintiff's claims, the factfinder must determine whether Defendant used prudent methods to monitor compensation it caused the Plan to pay for recordkeeping, whether the fees were reasonable and prudent, and the proper benchmarks to measure Plan losses.

Separate individual adjudications to resolve any of those issues would create incompatible standards for Defendant. Such conflicting orders in "thousands of separate individual actions" would put Defendant in the "untenable" position of

being subject to "differing standards of duty and, thus, differing standards of conduct," thereby leaving Defendant "in limbo" and "making compliance impossible." *Shanehchian v. Macy's, Inc.*, No. 07-828, 2011 WL 883659, *9 (S.D. Ohio Mar. 10, 2011). As courts including in the Eleventh Circuit have recognized, such claims should be certified under Rule 23(b)(1)(A). *Piazza*, 273 F.3d at 1352–53; *Krueger*, 304 F.R.D. at 576–77 (citing cases).

Because of the trust-like nature of a defined contribution plan like the Plan here, with fiduciary duties owed to the plan and not to individual participants, many courts have found ERISA prudence claims to be paradigmatic Rule 23(b)(1)(B) class actions. *Tatum v. R.J. Reynolds Tobacco Co*., 254 F.R.D. 59, 67 (M.D.N.C. 2008); *Schering,* 589 F.3d at 604; *Krueger,* 304 F.R.D. at 577–78. Even if absent participants were not barred by res judicata from litigating the same claims on behalf of the Plans (*see Smith v. Bayer Corp*., 564 U.S. 299, 313–15 (2011)), as a "practical matter" a prior adjudication of whether the fiduciaries breached their duties to the Plans would influence a subsequent court's adjudication of the same claims. Thus, Plaintiffs' satisfy both Rule 23(b)(1)(A) and (b)(1)(B).

## V. <u>CONCLUSION</u>.

For all of the foregoing reasons, Plaintiffs respectfully request that this Honorable Court grant their Motion for Class Certification.

DATED this 20th day of October, 2025.

Respectfully submitted,

/s/Brandon J. Hill

**BRANDON J. HILL** (*pro hac vice*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*pro hac vice*)
Florida Bar Number: 053643
**AMANDA E. HEYSTEK**
(*pro hac vice*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Main No.: 813-224-0431
Fax: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com

**MARC R. EDELMAN** (*pro hac vice*)
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

**JEREMY R. STEVENS**
Georgia Bar Number 24040548
**MORGAN & MORGAN, P.A.**
191 Peachtree Street N.E., Ste. 4200
Post Office Box 57007
Atlanta, GA 30343-1007
Phone: (404) 965-1682
Email: jstephens@forthepeople.com

**MICHAEL C. MCKAY**
(*pro hac vice*)
MCKAY LAW, LLC
5635 North Scottsdale Road, Suite 170

Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

***Attorneys for Plaintiffs and Proposed Class Counsel***

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 20th day of October, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of the electronic filing to all counsel of record.

/s/Brandon J. Hill
**BRANDON J. HILL** (*pro hac vice*)

**CERTIFICATE OF COMPLIANCE**

**I HEREBY CERTIFY** that this brief complies with Local Rule 7.1(D) and has been prepared with one of the font and point selections approved by Local Rule 5.1(C), specifically Times New Roman, 14 point font.

/s/Brandon J. Hill
**BRANDON J. HILL** (*pro hac vice*)