# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CASE NO.: 1:22-cv-04879-SCJ

JORGE MIRABAL and ALAN SCHOENBECK, individually, and all others similarly situated, and on behalf of the NCR Savings Plan,

Plaintiffs,

vs.

NCR CORPORATION,

Defendant.

DEPOSITION OF PATRICK CARROLL

Taken on Behalf of Plaintiffs

DATE TAKEN: JULY 30, 2025

TIME: 1:05 P.M. - 2:20 P.M.

PLACE: ALL PARTIES APPEARED REMOTELY

Examination of the witness taken before:

Amanda L. Daniel-Ennis
Stenographic Court Reporter

APPEARANCES

Counsel for Plaintiffs:

BRANDON HILL, ESQUIRE
Wenzel Fenton Cabassa, P.A.
1110 North Florida Avenue, Suite 300
Tampa, Florida 33602-3343
bhill@wfclaw.com
(813)337-7992

Counsel for Defendant:

EMILY COSTIN, ESQUIRE
Alston & Bird, LLP
The Atlantic Building
950 F Street, NW
Washington, D.C. 20004
emily.costin@alston.com
(202)239-3695

MICHELLE JACKSON, ESQUIRE
Alston & Bird, LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
michelle.jackson@alston.com
(404)881-7870

I N D E X

WITNESS PAGE

Called by the Plaintiffs:

PATRICK CARROLL

DIRECT EXAMINATION BY MR. HILL.................... 5

CERTIFICATE OF REPORTER OATH...................... 41

CERTIFICATE OF REPORTER........................... 42

WITNESS READ & SIGN LETTER........................ 43

ERRATA SHEET...................................... 44

E X H I B I T S

PLAINTIFFS' PAGE

Exhibit 1 2017 Form 5500 20

Exhibit 2 From 408(b)(2) - 6/30/2017 25
Bates Nos. NCR-Schoenbeck 5972 - 5980

Exhibit 3 NCR Corporation Meeting Agenda - 32
11/28/17
Bates Nos. NCR-Schoenbeck 6831 - 6832

E X H I B I T S


| PLAINTIFFS' | | PAGE |
|---|---|---|
| Exhibit 4 | 11/28/17 Meeting Minutes of the Plan Administration Committee Bates Nos. NCR-Schoenbeck 6817 - 6818 | 34 |
| Exhibit 5 | 11/28/17 Handout - Developments in ERISA Fiduciary and Benefits Law NCR Plan Administrative Committee Bates Nos. NCR-Schoenbeck 6819 - 6830 | 36 |

THEREUPON, the following proceedings were had and taken at 1:05 p.m.:

THE COURT REPORTER: Please raise your right hand. Do you solemnly swear or affirm that any testimony you give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

PATRICK CARROLL, called as a witness by the Plaintiffs, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HILL:

Q. Mr. Carroll, good afternoon, I'm Brandon Hill, I'm one of the lawyers for Alan Schoenbeck and Jorge Mirabal in a case they brought against the NCR Corporation Plan Administration Committee. We're here today to take your individual deposition. I take a very relaxed deposition. I'm not here to trick you or argue with you or anything like that. I just want to know what it is you know about certain questions and issues that I'll bring up.

If you need a break, let us know. Obviously we're going to take a break, as discussed earlier, when needed. And if you can't hear me or something gets

had proper membership with people being -- you know, having the right experience and credentials and fulfilling fiduciary training, and just generally fulfilling the permissive requirements to administer the Committee in keeping with the guidance under ERISA.

Q. All right.

A. All for the benefit of the Plan participants. So that was my role as the -- when I was the Committee chair, that was the role.

Q. You mentioned the word fiduciary training, the phrase fiduciary training; is that correct?

A. Yes.

Q. And so understanding that it was in 2010, prior to joining the Committee, did you receive any sort of fiduciary training?

A. Yes.

Q. Okay. What type of training did you receive related to fiduciary responsibility?

A. Yeah, I served in similar capacities, and having performed the role of VP of Total Rewords, I served as the chair of the ERISA Benefits Committee in prior companies, and fulfilled similar duties, which included fiduciary training. And I had, you know, the typical fiduciary training in each one of those companies in my prior employment.

with respect to the EDS retirement plan?
A. During my employment with EDS, I was responsible for executive compensation, and worked very closely with the benefits team as it related to reviewing matters with the account committee for approval through the regular annual process. So I was part of the compensation and benefits team that supported efforts to support the various plans for EDS.
Q. Okay. While you were with EDS, did you receive any sort of training related to assessing the reasonableness of recordkeeping compensation for the EDS retirement plan?
A. Yes.
Q. Okay. What training specifically can you recall?
A. Well, I would've participated in regular ERISA training for the Committee, and did. And then we -- as part of our duties, we did benchmarking of our various administrative plans, and so we worked with third-party providers to do assessments, and in some cases RFPs, to determine, you know, the market competitiveness and cost effectiveness of the various administration plans.
Q. So you're familiar with RFPs; is that correct?
A. Yes.
Q. You're familiar with benchmarking for

committee members.

Q. Okay. And do you recall how many -- the value of the assets under management at Celanese?

A. I don't recall the exact amount, but it was a much smaller plan, probably, you know, below five hundred million.

Q. All right. Was Fidelity the recordkeeper as to the Celanese plan?

A. I don't recall.

Q. And do you recall if Fidelity was the recordkeeper for the EDS plan?

A. It was.

Q. Turning to NCR, do you recall approximately when you became chair of the Committee?

A. I don't recall.

Q. Okay. Were you the chair of the Committee when you left in 2018?

A. Yes.

Q. Do you recall if you were the chair of the Committee in the years 2016 forward through your departure?

A. Yes.

Q. And generally speaking, from 2016 to 2018, in addition to the Committee, the NCR Corporation Plan Administration Committee, was there also an investment

committee?

A. Yes.

Q. Were you on that committee, too?

A. I was, yes.

Q. And from 2016 to 2018, were you a fiduciary to the Plan?

MS. COSTIN: Object to the form. Calls for a legal conclusion.

A. Yes.

MS. COSTIN: Just give me a chance to object, Pat.

THE WITNESS: Sorry.

Q. All right. And after you became a member of the committee, did you receive fiduciary training related to recordkeeping for the Plan?

MS. COSTIN: Object to the form.

THE WITNESS: So can I answer?

MS. COSTIN: Yes, yes.

A. Okay. So the fiduciary training typically is broad in nature and covers various duties and responsibilities under ERISA, and would've talked about the requirement to provide reasonable fees for plan participants, so in that regard, yes.

Q. Are you able to recall any specific instances of training related to recordkeeping specifically while

you served on the Committee?
MS. COSTIN: Object to the form.
A. (Unintelligible).
Q. I'm sorry, I didn't -- what was your answer?
A. My answer's no.
Q. While you served as the chair of the Committee, were there any written policies in place that specify what type of training fiduciaries were supposed to receive?
A. Written policies, no.
Q. How often, while you served as chair of the Committee, did you receive fiduciary training related to the Plan?
MS. COSTIN: Object to the form.
THE WITNESS: Can I answer?
MS. COSTIN: You can answer unless I tell you not to, but go ahead.
THE WITNESS: Okay. Thank you.
A. Yeah, we -- typically, in all of my instances we would have annual training for fiduciary training, and regularly would have outside counsel brush up on current events and provide supplemental training as issues arised. And then we also, as Committee Chair, responsible for people joining and fulfilling the various positions on the Committee. Any new members, I

would also require that they would receive fiduciary training either through outside counsel or investment advisor. So, you know, I say once annually, and then regularly at each meeting when it became necessary to supplement.

Q. Okay. And with regards to the annual training, while you were the Committee's chair, who performed that training, do you remember?

A. Again, it would be either outside counsel or the retained investment advisor.

Q. Do you recall who the investment advisor was when you served as chair of the Committee?

A. So as you noted, the investment was under the structure of the Pension Investment Committee, it was not the responsibility of the Pension Administration Committee, and so the answer to your question is we did not have an investment advisor for the Pension Administration Committee as far as I know.

Q. Okay. Focusing on 2016 to 2018, let me break it down by year. Do you know approximately -- and I apologize for this being repetitive, but I'm going to go 2016, 2017, 2018, okay? So in 2016, do you know approximately how many plan participants were in the Plan?

A. My recollection is roughly 15-, 16,000 in the

Q. Okay. And you said we would've negotiated, did you negotiate with Fidelity?
A. Of course, yes.
Q. You personally did?
A. Yes.
Q. Okay. Who did you negotiate with at Fidelity to get that number?
A. Well, we did it as part of our responsibility for the Plan. So myself, Doug, and Cathy would've regularly interacted with Fidelity to negotiate contracts, fees, and renewals.
Q. All right. Do you remember anybody specifically at Fidelity that you negotiated with?
A. At the time -- so we -- yeah, I guess -- I can't recall, we had a change in our account executive. It used to be Tracy Dunham initially when I first joined, and then it became Paul Lowe. So I would guess that at about this time this was Paul Lowe was our primary contact.
Q. All right. So did you negotiate an asset-based recordkeeping fee with Fidelity, or was it a contracted per participant annual fee?
A. Yeah, I mean, over time we sought to negotiate a per participant fixed fee that was competitive with the market for the size and scope of our plan.

Q. Okay. And so do you know why there's a percent here based on asset size to come up with that number?

A. Well, I think they're showing you the percent of assets, to put it in relative terms. But you see there's both an asset-based and a recordkeeping billable transaction rate, because the Plan obviously had both. And that was a deliberate strategy of ours, which was to seek to get the lowest fixed per participant fee that we could get from Fidelity, and reduce down the exposure to the asset-based fees, which are typically associated with what they call revenue-sharing in some of those investment choices that have load fees or other fees that are, you know, more retail-type investment choices.

And so this was a deliberate strategy, again, for myself and our committee to negotiate the best possible fixed fee given the size of the Plan with Fidelity at the time. So we sought to negotiate with Fidelity to get the best fixed fee for plan participants.

Q. Okay. And so how did you go about doing that?

A. Yeah. Over time we used various approaches. I think in this time frame and in this context, we did an RFP with Fidelity to look at the scope of services across multiple requirements. The NCR plan and administration across the Plan is complex. It wasn't

employee experience is important. And so we were looking at, you know, that full spectrum of user experience, plan offerings, and competitive fees across those various service lines so we could get the right answer. And we thought that in order to do that, at that time, an RFP was warranted to make sure we got the right outcome.

Q. Do you think RFPs are effective?

A. They can be, yes.

Q. And do you have an opinion as to how often RFPs should be conducted?

A. I don't have an opinion. You know, I think -- I do think RFP is something you do -- you know, sometimes you need to do an RFP, and sometimes a market check using benchmarking is a suitable alternative. So really, it depends on the facts and circumstances.

But RFP can be a very effective way, and it certainly can produce the best financial answer. But again, we were -- you know, at that time we were looking at multiple dimensions and decided an RFP was warranted to solve a bigger problem.

Q. Okay. And did the RFP that you conducted, that the Committee conducted in 2015 -- well, let me start over.

Who actually did the RFP in 2015, do you

remember?

A. Yeah, we engaged Hager Strategic to conduct the RFP.

Q. Okay. And did you consider Hager to be a fiduciary to the Plan?

MS. COSTIN: Object to the form. Calls for a legal conclusion.

A. Yeah, so I can't say for sure if they were fiduciaries. I'm not versed in that.

Q. All right. And did the RFP result in a reduced contracted recordkeeping amount on the per participant basis?

A. I recall that it did.

Q. So it worked?

A. Yep.

Q. Do you remember approximately how much the RFP resulted in terms of a decrease of the contracted recordkeeping amount on a per participant basis, approximately?

A. I don't recall the decrease, but $45.00 that's sort of in the middle of the page there is the magic number. We remember the $45.00 fee. So that was, I believe, the outcome, at least on the ASO fee related to the recordkeeping.

Q. I'm going to show you a meeting agenda and some

Stewart were all committee members attending, correct?

A. Yes.

Q. And then other attendees, non-committee members, were Laura Foltz, F-o-l-t-z, legal counsel in-house for NCR, correct?

A. Yes.

Q. And do you remember -- and maybe it says it in the minutes -- who actually kept the minutes at this time?

A. Well, I think Laura Foltz was the secretary for the Committee. But, you know, as a group, we did that work together, so I think we shared drafting of the minutes. So one of the team members on my team would've drafted, and Laura Foltz would've reviewed and approved the minutes for the Committee.

Q. All right. Give me just one second to look at the minutes here. I'll show you what we'll mark as Plaintiffs' Exhibit 4. These are the meeting minutes, I believe, from the meeting we just discussed. And for record, this is Bates 6817 to 6818. I'll let you read the whole thing, just let me know when you want me to scroll, please.

(Plaintiffs' Exhibit 4 was marked for identification.)

A. You can scroll.

Q. All right.

A. Okay.

Q. Are these typical meeting minutes that you saw when you were the Committee Chair of the Plan?

A. Yes. And you see Laura Foltz drafted those, and we would've reviewed them, and then I would've presented them at the Committee for approval.

Q. And near the bottom, there's a fiduciary update, it says, "At the Chair's request." That's you, correct?

A. Yes.

Q. "Ms. Foltz and Ms. Barker presented an update on fiduciary developments from a legal perspective. Ms. Barker discussed recent Department of Labor developments, the status of tax reform initiatives, and certain litigation and other matters. A discussion ensued."

What's the certain litigation?

A. I don't recall if that was -- what that was about in particular without seeing the materials. But again, recalling what I mentioned before, it's incumbent upon my part as the chair of the fiduciary committee, we should be asking our advisors to share updates on any developments around legal matters that are trending and we're discussing for the Committee to consider that

might help us direct our work going forward, and activities, so that we, again, are providing the best plan options and choices for our participants at the lowest fees. So it's important to understand the legislative environment so that we can be focused on the right matters that, you know, are for the benefit of participants.

Q. Okay. I'm going to show you what we'll mark as -- I'm going to show you what we'll mark as Plaintiffs' Exhibit 5. I believe this was a handout at the November 28, 2017 meeting, committee meeting. It's about -- well, I guess this is about 12 pages. Let me just read the Bates numbers real quick, and then I'll -- just give me one second. I'm going to ask you about this page, page 6.

(Plaintiffs' Exhibit 5 was marked for identification.)

A. Okay.

Q. And that's it. So it's Bates 6819, NCR6819 through 6830. Mr. Carroll, I'll let you read the whole thing if you want to, otherwise I'm going to go to the page I'd like to ask you questions about.

A. That's fine.

Q. And it looks like, just for the record, this a November 28, 2017 handout from the Morgan Lewis law

firm, a Miss Rosina B. Barker is listed as the author. It is called "Developments in ERISA Fiduciary and Benefits Law NCR Plan Administration Committee." Did I read that correctly?

A. Yes.

Q. Page 6, I'm going to let you just read it, will you, and I'm going to ask you questions about it. Tell me when to flip.

A. Yes, I'm ready.

Q. All right. So back in November of 2017, outside counsel, Morgan Lewis, Ms. Barker, provided a handout to the Committee that said in the first bullet point on page 6 of her handout, "Plaintiffs' firms keep up pace of litigation claiming excessive fees, poor investment performance in 401(k) plans." And it looks like she listed some settlements in the ERISA space; is that correct?

A. Yes.

Q. And in her second dash, or bullet point, I guess you could call it, it says "Excessive recordkeeper." Do you see that?

A. Yes.

Q. Did y'all talk about excessive recordkeeper fee cases at this particular committee meeting, if you remember?

A. I don't recall. But, you know, given the materials, we would've had good discussion about the items Rosina presented, yes.

Q. Do you recall any of those specifics about discussing excessive recordkeeping fees at this committee meeting?

A. No.

Q. Was this the only committee meeting you can recall discussing litigation related to excessive recordkeeping fees?

A. I don't recall.

Q. Would excessive recordkeeping fee -- well, strike that.

And so you were not at NCR for the 2019 benchmarking, correct?

A. If it occurred after May of 2018, no.

Q. And you don't know anything that happened with regard to the Plan after May of 2018, correct?

A. No.

MR. HILL: Let's take a break. I probably only have -- I don't even know if I have 20, 30 more minutes. Let's come back at 2:15.

MS. COSTIN: Okay.

(Recess from 2:09 p.m. until 2:18 p.m.)

BY MR. HILL:

Q. Mr. Carroll, real quick, have you read the complaint in this case?

A. I have.

Q. All right. And I don't want to know what you talked with your lawyers about, but excluding conversations with your lawyer, what, if anything, did you do to prepare for today's deposition?

A. So I had phone calls with the team here, a couple of phone calls just to brief me and, you know, give me a view of what the complaint was.

MS. COSTIN: I'm just going to caution you not to talk about what we talked about.

THE WITNESS: Yeah.

MS. COSTIN: Thanks.

Q. Is the team you're referring to the lawyers?

A. Yes.

Q. Did you see anything in the complaint that you didn't agree with?

A. I have to think about that. So anything I didn't agree with? Yeah, I disagree with the complaint, if that's what you're asking.

Q. Why is that?

A. I believe that we provided the lowest fees to our plan participants, and pursued doing that over time very effectively.

Q. Okay. If you were going to explain how you accomplished that as the Committee chair, how would you explain it?

MS. COSTIN: Object to the form. Go ahead.

A. Yeah. You know, we've talked about this. It's just the regular process to review the administrative costs and offerings of the Plan, and engage in a process to make sure we're providing and paying competitive fees for plan participants.

MR. HILL: I don't have any additional questions for you. I appreciate your time.

MS. COSTIN: Great. Brandon, I don't have any questions. Thank you, Mr. Carroll.

THE COURT REPORTER: And then, Ms. Costin, is he reading, as well?

MS. COSTIN: He will read and sign, yes. Thank you.

MR. HILL: And we'll order the same, a week if you can do it.

THE COURT REPORTER: One week, not a problem.

MS. COSTIN: A week.

THE COURT REPORTER: All right.

THEREUPON, the Deposition of Patrick Carroll, taken at the instance of the Plaintiffs, was concluded at 2:20 p.m.

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA
COUNTY OF PASCO

I, Amanda L. Daniel-Ennis, Stenographic Court Reporter, and Notary Public in and for the State of Florida at large, hereby certify that the witness named herein appeared before me remotely on July 30, 2025, and was duly sworn.

WITNESS my hand and official seal this 08/06/2025.

AMANDA L. DANIEL-ENNIS, COURT REPORTER
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION NO. HH562828
EXPIRES: 7-1-2028

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PASCO

I, Amanda L. Daniel-Ennis, Stenographic Court Reporter, do hereby certify that I was authorized to and did stenographically report the examination of the witness named herein; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel for any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

DATED THIS 08/06/2025 at Pasco County, Florida.

AMANDA L. DANIEL-ENNIS,
COURT REPORTER and NOTARY PUBLIC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ALAN SCHOENBECK and JORGE MIRABAL, and individually, and on behalf of the NCR Savings Plan,<br>Plaintiffs,<br><br>v.<br><br>NCR CORPORATION PLAN ADMINISTRATION COMMITTEE,<br>Defendant. | Civil Action No. 1:24-cv-00765-SCJ<br><br>Hon. Steve C. Jones |

I, Pat Carroll, declare under penalty of perjury of the laws of the United States of America that the testimony contained in my deposition taken on July 30, 2025, is true and correct, with the exception of the following changes:

| Page | Line | Change | Reason |
|---|---|---|---|
| 9 | 20 | Change "Total Rewords" to "Total Rewards" | Spelling Error |
| 15 | 23 | Remove "we also" | Clarification |
| 15 | 24 | Insert "I was" before "responsible" | Clarification |
| 16 | 14 | Change "Pension" to "Plan" | Clarification |
| 16 | 15 | Change "Pension" to "Plan" | Clarification |
| 16 | 17 | Change "Pension" to "Plan" | Clarification |

September 5, 2025

Date

Signature