# EXHIBIT 20

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
CASE NO: 1:24-CV-00765-SCJ

ALAN SCHOENBECK and JORGE MIRABAL, and individually, and on behalf of the NCR Savings Plan,

Plaintiffs,

vs.

NCR CORPORATION PLAN ADMINISTRATION COMMITTEE,

Defendant.

July 10, 2025
10:06 a.m. - 12:37 p.m.
Morgan & Morgan, P.A.
703 Waterford Way
Suite 1000
Miami, Florida 33126

DEPOSITION OF JORGE MIRABAL

Taken before ELENA ROBAINA, Stenographer, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.

Thereupon:

JORGE MIRABAL

was called as a witness and, having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. CROHAN:

Q. Good morning, Mr. Mirabal.

A. Good morning.

Q. My name is Blake Crohan. How are you this morning?

A. I'm good.

Q. Good.

Do you go by Jorge or George?

A. I go by Jorge.

Q. Jorge, okay.

Is your legal name Jorge?

A. My legal name is J-O-R-G-E.

Q. Okay.

A. Yes. That was never an issue before 9/11.

Q. All right. So I guess just for the record, will you please state your full name?

A. Jorge Mirabal.

Middle name too?

understand the question; is that fair?
A. Of course.
Q. Okay. Is there any reason that you can't provide truthful testimony today?
A. No.
Q. Have you taken any medications that may affect your ability to understand my questions today?
A. None.
Q. Okay. Mr. Mirabal, what did you do, if anything, to prepare for today's deposition?
A. To prepare for today's deposition, basically I knew that it's occurring today. I set the alarm clock and here I am. Nothing major. I mean, in advance, my work with Brandon back and forth.
Q. Okay. So you met with your attorneys to prepare for today's deposition?
A. Yes, we did.
Q. Okay. And how long did you meet with your attorneys to prepare for today's deposition?
A. There were multiple calls, but if I had to guess, maybe a couple of hours.
Q. Would you say more or less than five hours?

A. Less.
Q. More or less than three hours?
A. Approximately.
Q. Approximately three hours?
A. Yes.
Q. Okay. Did you review any documents in preparation for today's deposition?
A. I have in the past. Not recently.
Q. Not recently, okay.
When did these conversations with your attorney take place?
A. They took place yesterday, the day before, and the day before that.
Q. So the last three days you've spoken to your attorneys?
A. About this particular deposition?
Q. Correct.
A. Yes.
Q. Okay. And did you review documents over the past three days in preparation for today's deposition?
A. Some.
Q. You did?
A. Some.
Q. Okay.

A. Online.
Q. You reviewed those documents online?
A. Yes.
Q. Okay. And what -- can you describe what those documents were for me?
A. Just my Fidelity app to, you know, just go back and forth. There's nothing in it, but looking at the Fidelity.
Q. So you're talking about looking at your Fidelity account statement?
A. Correct. Just the account online, not a statement.
Q. Okay. And this is in a -- so you were just looking at the Fidelity app itself?
A. Yes. Just to make sure that it was still open, available even though I've closed the account.
Q. Okay. All right. Did you discuss today's deposition with anyone other than your attorneys?
A. My wife knows that I am here.
Q. Okay. Are you currently employed?
A. I work for myself.
Q. Okay.
A. I own a business.

Q. Okay. Did you talk to anyone at your business about --
A. No.
Q. I'll just ask you, let me get the full question out before you answer, Mr. Mirabal; is that okay?
A. Yep.
Q. Okay. Great.
So you haven't spoken to anyone other than your wife and your attorneys about today's deposition?
A. That is correct.
Q. Okay. Okay.
All right. I just want to go over a little bit of background about today's deposition. When is the first time that you became aware that your deposition was requested in this case?
A. I don't know exactly the date.
Q. Okay. Can you -- was it within the past week?
A. No.
Q. Okay. Was it within the past month?
A. Maybe, approximately.
Q. Okay. And who are your attorneys in this case?

A. My attorney is Brandon Hill.
Q. Have you executed any agreements with your attorneys?
A. We have.
Q. Okay. And that's related just to this case?
A. Only, yes. In other words, exclusively, yes. The answer is yes.
Q. Okay. Have you ever used Mr. Hill to represent you in any other legal matters?
A. No.
Q. Okay. Have you ever used his law firm to represent you in any other legal matters?
A. No.
Q. And when you first became aware that your deposition was requested in this case, were you aware that that deposition was going to take place in person?
A. No.
Q. Okay. When did you first become aware that your deposition was supposed to take place in person?
A. Yesterday.
MR. CROHAN: This will be Exhibit 1.
(Thereupon, Defendant's Exhibit 1

was marked for identification.)
BY MR. CROHAN:
Q. Mr. Mirabal, have you seen this document before?
A. I don't believe so.
Q. I'll let you just take a minute to review it and just confirm whether or not you believe you've seen that document before.
A. No, I still don't believe so.
Q. If you take a look at the first page, it states (as read): "Please take notice that defendant, NCR Corporation planned administration committee, will take the deposition of plaintiff, Jorge Mirabal, on Thursday, July 10th, 2025, beginning at 9:30 a.m. Eastern time. The deposition will take place at the law offices of Wenzel Fenton Cabassa, P.A. in Tampa, Florida." Do you see that?
A. I do.
Q. Were you aware that your deposition was originally scheduled to take place in person in Tampa?
A. No.
Q. Were you aware that we had to reschedule your deposition to take place here in

Miami instead of Tampa?
A. Reschedule location?
Q. Correct.
A. Yes.
Q. How did you find that out?
A. Yesterday I was told that it would not be on Zoom, that it would be in person someplace in downtown Miami.
Q. Okay.
MR. CROHAN: This will be Exhibit 2.
(Thereupon, Defendant's Exhibit 2 was marked for identification.)
BY MR. CROHAN:
Q. Mr. Mirabal, have you seen this document before?
A. No.
Q. I'll represent to you, and as you can see from the Certificate of Service, this is the amended notice of deposition for you in this case that was served yesterday to take place here in Miami.
Let's get a little bit of personal background. Can you state your date of birth for the record, please?
A. [redacted] 1959.

Q. And where do you currently live?
A. I live in the Miami Beach area, Harbor Island.
Q. And approximately how far is that from the location where we are today?
A. Usually 20 to 30 minutes.
Q. And today's deposition, as you can see from that notice in front of you, was scheduled to start at what time?
A. The form says 9:30.
Q. Okay. And what time did you show up for today's deposition?
A. I showed up at the time I was advised, ten o'clock.
Q. Okay. All right. Are you currently married?
A. Yes.
Q. And what's your spouse's name?
A. Felicia.
Q. And does she live with you here in Miami?
A. Yes.
Q. Let's talk a little bit about your educational background. Did you go to college?
A. Yes.

the banking committees to introduce our product to.
Q. Okay. Were you terminated from VoltCash?
A. No.
Q. Okay. Did you voluntarily leave from VoltCash?
A. Yes.
Q. All right. And after VoltCash where did you go to work?
A. Then came NCR.
Q. And that would have been approximately 2021?
A. Sounds about right.
Q. Why did you decide to apply for a job at NCR?
A. Well, they actually reached out to me. I knew all of those people, they knew me. When I worked at WorldPay, I actually sat in the office at NCR, so they knew me.
Q. Okay. And you thought NCR is a reputable company?
A. Yes.
Q. And what do you recall about the interview process for the job at NCR?
A. The interview process, I was

interviewed by Todd Wallin, who I used to -- he used to be a colleague of mine previously, and we just chatted.

Q. So you knew Todd from when you were working at WorldPay?

A. Correct.

Q. And do you recall what Todd's position was at NCR at the time?

A. He was the manager.

Q. And that was a -- was that at a location here in Miami?

A. Well, he was remote. He's in Lakeland, Florida, but he was responsible for Tampa, Orlando, and all the way south.

Q. Did you meet with Todd in person for your interview?

A. I did not.

Q. Okay.

(Thereupon, Defendant's Exhibit 3 was marked for identification.)

BY MR. CROHAN:

Q. All right. Mr. Mirabal, we're looking at what's been marked as Exhibit 3, and for our reference, Mr. Mirabal, if you look at the bottom right-hand corner, do you see where it says NCR

Schoenbeck 6589?
A. I do.
Q. Okay. When I'm asking you to flip the documents, that's going to be the document number that I'm talking about, just so we're on the same page.
I'll just start -- and take your time if you'd like to review this or flip through it, I can give you time, but my first question is just going to be, do you recognize what this first document is here?
A. It's a welcome letter. It's an employment welcome letter.
Do you need me to flip through it now or not yet?
Q. You're more than welcome to flip through it if you would like to. I am going to have some questions, but if you want to flip through it, please feel free to do so.
A. Okay.
Q. The next page I was going to just draw your attention to was NCR Schoenbeck 6591.
A. Uh-hmm.
Q. And if you look at the bottom where it says "Variations" --

A. Uh-hmm.

Q. -- and then the second paragraph there says (as read): "This offer of employment is contingent upon your agreement to the conditions of employment outlined in this employment letter in appendix A and your successful passing of a background check." Do you see that?

A. I do.

Q. And you passed the background check, I'm assuming, since you worked for NCR?

A. Of course.

Q. Okay. All right.

And on the next page, 6592, the very last paragraph, you see it says (as read) "If you have any questions regarding the details of this offer, please contact someone with NCR," and it's signed by Todd Wallin. Do you see that?

A. Yes.

Q. Is it fair to say this is your offer letter to work at NCR?

A. Yes, this is an offer welcome letter.

Q. Okay. All right. If you go to the next page, which is 6593, in the middle paragraph you see it states (as read): "You further acknowledge that this employment letter and

Appendix A reflect the general description of the terms and conditions of your employment with the company." You see that?

A. I do.

Q. And you understood that these were the terms and conditions of your employment when you worked at NCR?

A. Yes.

Q. Okay. And the last paragraph says (as read): "I have read the foregoing information relative to the company's conditions of employment and understand that my employment offer is conditioned upon their satisfaction."

A. I do.

Q. And you recall reading this document when you received it?

A. Yes.

Q. Okay. And you wouldn't sign a document that you hadn't read, correct?

A. No.

Q. Okay. All right. And if we go to 6595.

A. Okay.

Q. And do you see your electronic signature on that page?

A. Yes.
Q. And you recall electronically signing this document?
A. Yes.
Q. Then if you'll flip to 6604. Actually, I apologize, let's go back to 6596. And at the very top of that it says (as read): "By accepting NCR's offer of employment, I indicate my understanding of an agreement to each of the following employment terms and conditions." Do you see that?
A. Yes.
Q. And again, you accepted employment with NCR, correct?
A. Yes.
Q. All right. And then if you flip to 6599, you understood in paragraph 19 that the agreement could be executed electronically, correct?
A. Of course.
Q. And then on 6604, is this your electronic signature on that document?
A. It is.
Q. And you recall signing this document?
A. I do.

Q. All right. So let's -- we can go back to the very first page, which is 6589 of this document and -- actually, let's go to 6590, which is the next one. I just want to get a general understanding of when exactly you started. Is it approximately correct that you started working at NCR in October of 2021?
A. I'll say it is --
Q. Okay.
A. -- because it says so right there.
Q. Okay.
Did you review your offer letter and these agreements that you executed with anyone?
A. No.
Q. You didn't review them with an attorney?
A. No.
Q. All right. And what was your job title, do you recall, with NCR?
A. I don't remember exactly. Sales agent, sales representative.
Q. It says on 6589 "a territory account manager." Does that sound about right?
A. That sounds about right.
Q. All right. And just generally, what

Q. Okay. And is that why you were told that you were terminated?
A. That's what I was told.
Q. Did you believe that your performance justified your termination?
A. No.
Q. And why do you say that?
A. Because I was doing just as well as everyone else and because I was not getting the leads that were being given to other employees.
Q. When you say you were doing just as well as other employees, I think you said that most employees weren't meeting their goals.
A. That is correct.
Q. Okay. So you were performing as poorly as other employees?
A. Exactly.
MS. HEYSTEK: Object to form.
You can answer.
Give me a moment to put an objection on the table and then answer.
BY MR. CROHAN:
Q. How soon after your termination did you start looking for a lawyer?
A. Soon after.

Q. Would you say within a week?
A. Within a couple months.
Q. And what was -- why were you looking for a lawyer?
A. Because of the fact that Pam was giving leads to, you know, people that she found interesting or attractive. Leads that were originally even promised to me never made it to my desk, to my in box.
Q. Okay. And how did -- when did you just start looking for a lawyer?
A. The fact that I -- Pam even admitted to me that she was interested in certain people and, you know, she'd go drinking with them and so on and they would be getting my leads.
Q. Yeah, my question was just what did you do to go start looking for a lawyer? Did you go on a -- do a Google search or did you ask around? Just trying to figure out.
A. I just went online.
Q. And who did you contact?
A. I contacted a number of attorneys.
Q. And who were those attorneys?
A. I don't recall.
Q. Approximately how many different

attorneys did you contact?
A. Maybe three or four.
Q. Was the Wenzel Fenton firm the first firm that you contacted?
A. Possibly. Yes, I think so.
Q. And you contacted two or three others after them?
A. I did.
Q. And how did you find the Wenzel Fenton firm?
A. Online.
Q. When you were looking at them online, did you do any research about the firm?
A. I don't know any of them, so no.
Q. No?
A. Nothing that's credible.
Q. And you were looking for a lawyer because you thought you were wrongfully terminated?
A. Yes.
Q. And did you consider filing a lawsuit against NCR for wrongful termination?
A. That was my intent, yes.
Q. In the personal injury lawsuit that I believe you said was filed on your behalf about ten years ago, did you give a deposition in that case?

Q. So you believe that Pam was sexually discriminating against you?
A. She was having romantic interests in other individuals. Maybe I don't know what the law considers sexual discrimination, but her interests were sexual.
Q. Okay. And so that was why you were going to look for a lawyer?
A. I was going to look for a lawyer because I felt I was wrongfully terminated.
Q. Have you ever filed a claim with the EEOC?
A. No.
Q. Did you express these thoughts that you had about Pam with anyone else at NCR?
A. Absolutely.
Q. And who was that?
A. My colleagues.
Q. Who were they?
A. Carlos. I don't recall his last name. A number of them. It was a joke. It was a joke amongst the small team.
Q. Okay. Name all the employees that you can remember?
A. I cannot do that.

Q. Okay. You remember Carlos?
A. Yes.
Q. Do you remember any others?
A. No, I don't remember others right now.
Q. Okay. Well, who were some of the other teammates?
A. I just answered that question. I don't remember any others.
Q. Okay. And that's what I want to make sure I understand. You don't recall any other names of the teammates --
A. I --
Q. Hold on one second. Let me finish my question.
You don't recall any of the other teammates that you worked with at NCR other than Carlos?
A. I answered that for the third time, no.
Q. Great. Thank you.
So other than Carlos, did you tell anyone else at NCR about these supposed things that were going on with Pam?
A. I will answer that again, yes.
Q. Okay. But you don't recall a single

name of any person that you told them too?
A. Fourth time, no.
Q. Okay. Who's the defendant in this lawsuit?
A. The defendant would be NCR.
Q. Okay. And what does it mean to be a class representative?
A. It means that I represent everyone else that is participating in this plan in this case.
Q. But you're not participating in this plan, correct?
A. I was. I'm not at this moment.
Q. Okay. And what do you believe your job or your responsibilities are as a punitive class representative?
A. Make sure that the right thing is done.
Q. Okay. And what do you think the right thing is?
A. The right thing is that you charge the right amount in this case, you know, that companies not be overly greedy.
Q. Do you believe NCR is being greedy?
A. I do believe so.

Q. And what's the basis for that?
A. The basis for that is the conversations that I've had with my attorney.
Q. Okay. Did you have those beliefs while you worked at NCR?
A. I was not aware of that.
Q. Do you know who Alan Schoenbeck is?
A. No.
Q. While you were an employee of NCR, did you ever attend any meetings of the NCR Savings Plan Administration Committee?
A. No.
Q. Do you know what the NCR Savings Plan Administration Committee is?
A. No.
MR. CROHAN: Let's take a five-minute break, if you don't mind.
THE WITNESS: Okay.
MR. CROHAN: Thanks.
(At this time a recess was taken.)
BY MR. CROHAN:
Q. Mr. Mirabal, in total, approximately how much time do you believe you've devoted to this case?
A. Oh, wow. In total? I wasn't prepared

BY MR. CROHAN:
Q. I'm sorry. She said --
A. She just objected.
MS. HEYSTEK: I just objected to form, but then I said you can answer --
THE WITNESS: Oh.
MS. HEYSTEK: -- so you just answered subject to my objection.
THE WITNESS: Okay.
I really don't know, procedurally, what is legal or not legal, so I can't answer that question.
BY MR. CROHAN:
Q. What's your understanding of the history of this case from the time it was filed till today?
A. Again, I don't know what else is being done. I just know my side.
Q. And what is your side? What do you know?
A. My side is to review the documents that were sent to me, to look at the information in Fidelity, you know, and to answer questions, and...
Q. Okay. And what are you seeking to recover as a result of this lawsuit?

A. I'm not seeking any amount.
Q. If you're not seeking any amount, then why did you decide to file this lawsuit?
A. It's just the right thing to do.
Q. Why do you believe it's the right thing to do?
A. Because it's the right thing to do because if the average or a normal amount for administering the case is $25 a year and NCR has been charging up to a hundred, it doesn't seem right.
Q. So you believe that you paid over a hundred dollars for recordkeeping fees?
A. I would not know.
Q. Did you look to see how much you were charged in recordkeeping fees before this lawsuit was filed?
A. No.
Q. What was the plans recordkeeping fee while you were a participant in the plan?
A. Again, I do not know.
Q. How much do you believe plan participants should have paid annually in a per participant recordkeeping?
A. From what I understand, $25 is the --

is the norm.

Q. And where did you gain that understanding?

A. From my attorney.

Q. And you gained that understanding after you were terminated from NCR?

A. That is correct.

Q. Have you ever spoken with anyone at NCR about these beliefs?

A. I have not.

Q. Do you know what the Employee Retirement Income Security Act is?

A. I do not.

Q. Do you know what fiduciary duties are under the Employment Retirement Income Security Act?

A. No.

Q. Other than the Wenzel Fenton firm, do any other lawyers represent you in this case?

A. No.

Q. Have you had any communications with Morgan & Morgan attorneys?

A. I am here right now. I believe so.

Q. Who from Morgan & Morgan --

A. I don't know. I haven't reached out

to anyone for this case or any other. I don't have any other cases either. But I may have called them. I'm pretty sure I have called them.

Q. And why are you sure -- why are you pretty sure you've called them?

A. Because I think that those are one -- that they are one of the ones that I called when I was first terminated, but it has nothing to do with this matter.

Q. Just to be clear, you're not represented by the Morgan & Morgan firm?

A. No.

Q. Are you represented by any other law firm other than the Wenzel Fenton firm?

A. No.

Q. And you have an agreement that says that?

A. I have an agreement with my attorney, yes.

Q. Okay. And why did you select the Wenzel Fenton firm to represent you?

A. No particular reason other than finding them online. I found them online.

Q. Are you business partners with any lawyers at the Wenzel Fenton firm?

ago.

Q. And I'm not trying to catch you up here, do you believe it's probably the end of 2022?

A. Sounds about right.

Q. All right. And you were terminated in June of 2022, correct?

A. Yes.

Q. Prior to the Complaint being filed on your behalf the end of 2022, did you review it?

A. Repeat that question.

Q. Sure.

Prior to the Complaint being filed on your behalf at the end of 2022, did you review it?

A. Yes.

Q. Okay.

A. Yes.

Q. How long did you review it?

A. How long did it take? I don't know, 45 minutes, an hour.

Q. Did you review it with anyone other than your attorneys?

A. No.

Q. Did you do anything to confirm the accuracy of the allegations in the Complaint?

A. I did not do any personal research.

Q. Okay. And what makes you say that?
A. The fact that I've reviewed every -- what I think was every document with my attorney.
Q. Well, we just --
A. And he's reviewed it with me.
Q. Sorry.
But we just reviewed a few documents that you hadn't seen before, correct?
A. What I just said is the fact that everything that was filed -- that I believe was filed was reviewed with me.
Q. Do you believe that the NCR savings plan per participant recordkeeping fee was disclosed to you?
A. No.
Q. And you mentioned when we started today that you reviewed the Fidelity account, correct?
A. Yes.
Q. And so you knew when you were a participant of the NCR plan, you knew how to get on to your Fidelity account?
A. Yes.
Q. And you were aware that Fidelity would provide quarterly statements regarding your 401(k)

plan?

A. Yes.

Q. And you read those statements?

A. I would look at them, yes.

Q. Before we look at this one, Mr. Mirabal, you mentioned earlier that when you worked for WorldPay, that you participated in the 401(k) plan, correct?

A. Yes.

Q. Okay. When you stopped working at WorldPay in approximately 2019, what did you do with the funds that were in your 401(k) plan at WorldPay?

A. I withdrew them.

Q. And when you withdrew them, did you roll them into an IRA?

A. No, I did not.

Q. Did you roll them into any other 401(k)?

A. No, I did not.

Q. So when you withdrew them, you just took the cash?

A. Exactly, yes.

Q. Okay.

(Thereupon, Defendant's Exhibit 9

was marked for identification.)

BY MR. CROHAN:

Q. All right. So Mr. Mirabal, I'm showing you what's been marked as Exhibit 9. This is NCR Schoenbeck 00006286. Take your time to review the document if you'd like. My first question is just going to be, does this look like one of your account statements?

A. It looks familiar, yes.

Q. Okay.

All right. Mr. Mirabal, I'd like you to take a look at page 6289?

A. Okay.

Q. And I know you testified earlier that you reviewed your participant account statements, but you don't believe that the per participant recordkeeping fee was ever disclosed to you, correct?

A. That's correct.

Q. Well, let's look under Transaction Detail and under Transaction Type at the very top you see where it says "Recordkeeping Fee"?

A. Yes.

Q. Okay. And if you go to the far right it says 35 cents, correct?

A. I see that.
Q. So if you go down through this on 6289 and 6290, do you see where there are several transactions that say "recordkeeping fee"?
A. I do.
Q. So would you agree that the recordkeeping fee was disclosed to you?
A. It's on the statement, yes.
Q. And if you go to the first page, this is 6286, what's the time period for this quarterly statement?
A. 6286, it says October of '21 through December of '21.
Q. Do you know if Fidelity charges participant's fees for individual requests that they may make?
A. I have no -- no, I don't know.
Q. Okay. Well, you started withdrawing your money from your NCR 401(k) account in 2022, correct?
A. Okay.
Q. Okay. Why did you start withdrawing the money?
A. I don't recall. I probably needed it. I don't know.

Q. What was the process that you went through to withdraw the money from your account?
A. The process is to contact Fidelity.
Q. And so you just called Fidelity up and said I'd like to withdraw money?
A. That sounds right. Correct.
Q. And while you were a participant of the NCR 401(k) plan, did you frequently visit the Fidelity website?
A. I did.
Q. Okay. And what were you doing on the Fidelity website other than checking your participant accounts?
A. Nothing more than that.
(Thereupon, Defendant's Exhibit 10 was marked for identification.)
BY MR. CROHAN:
Q. Mr. Mirabal, we're now looking at what's been marked as Exhibit 10. This is NCR Schoenbeck 6313. Take your time to review it if you'd like, but does this look like another one of your participant savings?
A. Yes.
Q. And the time period for this is July 1st, 2022 through September 30th, 2022?

A. Correct.
Q. All right. All right. So if you look on -- so if you look on this very first page of this document, what does it show that your ending balance was?
A. Zero.
Q. And it shows your withdrawals of $5,614?
A. Yes.
Q. And so this was after you were terminated, correct?
A. Yes.
Q. All right. What did you do with the money that you withdrew from the NCR savings plan 401(k) plan?
A. Oh, I couldn't tell you.
MS. HEYSTEK: Object to form.
You can answer.
THE WITNESS: I can answer? Okay.
I don't know. I know that I was ill.
BY MR. CROHAN:
Q. Okay. My -- let me rephrase the question.
When you withdrew the money from the NCR 401(k) plan, did you roll it over into an IRA?

A. I did not.
Q. Did you roll it over into another 401(k) plan?
A. No.
Q. All right. If you look on 6314, do you see that there are fees under the activity called "Overnight Mailing Fee"?
A. Yes.
Q. And you understand this was a fee that you were charged for withdrawing your money from the 401(k) plan, correct?
A. I do.
Q. Is your Complaint about that fee as well?
A. No.
Q. So that's what I was talking about earlier, about trying to understand if your Complaint is about the fees associated with individual actions that participants request from Fidelity related to the 401(k) plan.
A. I see.
Q. And is that what your Complaint is about?
MS. HEYSTEK: Object to form.
You can answer.

THE WITNESS: My Complaint is not about the overnight mailing fee, no.
BY MR. CROHAN:
Q. And your Complaint is just about the per participant recordkeeping fee?
A. That is correct.
Q. Did you consult with an investment advisor about withdrawing your money from the NCR 401(k) plan?
A. No.
Q. Have you ever consulted with an investment advisor?
A. No.
Q. All right. Let's take a look again, Mr. Mirabal, at Exhibit 8. I think you might have it in front of you. Perfect.
A. Okay.
Q. There you are.
All right. Let's take a look at paragraph 53, which actually starts on page 15 and then goes onto 16. You can go ahead and read that paragraph if you'd like to yourself. My question is just about paragraph 53 --
A. Okay.
Q. -- which the second sentence says: "A

reasonable total fee for recordkeeping ought to be no more than $25 annually." Do you see that?
A. I do.
Q. What is your basis for that statement?
A. That is what my attorney advised me.
Q. Do you have any other basis for that statement?
A. Again, at my attorney's advice and the fact that my attorney has an expert witness he claims that he got that information from.
Q. Do you believe that every plan in the country is required to ensure their participants pay no more than $25 a year for recordkeeping?
MS. HEYSTEK: Object to form.
You can answer.
THE WITNESS: No, I don't believe that.
BY MR. CROHAN:
Q. Okay.
Then how much more than $25 is a reasonable recordkeeping fee, in your opinion?
A. Not much more than that, I mean, but it could go over, you know, by a few cents or a dollar. I'm just being technical, answering the question technically, but definitely not $40 if the

norm is 25.

Q. Okay. But more than 25 can be reasonable as well?

A. It can be.

MS. HEYSTEK: Object.

THE WITNESS: You might charge --

MS. HEYSTEK: Object to form.

You can answer.

THE WITNESS: -- one year 26, then the next year 24, and you come up with 25.

BY MR. CROHAN:

Q. So again, back to my question then that you believe then that every plan in the country has to ensure that their participants pay no more than $25 for recordkeeping?

MS. HEYSTEK: Object to form.

You can answer.

THE WITNESS: I believe that every plan in the country should charge what is reasonable.

BY MR. CROHAN:

Q. Okay.

A. And if that is the amount that is reasonable, then that's what they should charge.

Q. Okay. Well, this statement in

paragraph 53 says: "A reasonable total fee for recordkeeping ought to be no more than $25 annually."

A. Okay.

Q. So are you saying that if any plan in the country charges more than $25 it's not a reasonable fee?

MS. HEYSTEK: Object to form.

You can answer.

THE WITNESS: I'm saying they shouldn't.

BY MR. CROHAN:

Q. Are you aware that your lawyers in this case have alleged in another lawsuit that a plan that uses Fidelity as a recordkeeper was a well-managed plan and paid more -- participants paid more than $25 per participant?

A. I'm not aware of any other case.

(Thereupon, Defendant's Exhibit 11 was marked for identification.)

BY MR. CROHAN:

Q. Mr. Mirabal, I'm showing you what's been marked as Exhibit 11. I know it's a long document, so if you'd like to review it, you can take -- if you need to take a break to review it,

A. Yes.
Q. And it says you executed it on June 4th of 2025, correct?
A. Yes.
Q. All right. Did you review the responses to these interrogatories before you executed this declaration?
A. Yes.
THE WITNESS: If we go for a little while longer, can we take like a two, three-minute break?
MR. CROHAN: Absolutely. Take as much time as you need.
(At this time a recess was taken.)
BY MR. CROHAN:
Q. Mr. Mirabal, just to confirm, you are no longer a participant in the NCR 401(k) plan, correct?
A. Correct.
Q. And we looked earlier at the exhibit that showed that you had withdrawn all your money from the plan in 2022, correct?
A. Correct.
Q. So the plan's recordkeeping fee in 2023 did not affect you at all, correct?

A. In 2023, correct.
Q. And the plan's recordkeeping fee did not affect you at all in 2024, correct?
A. Correct.
Q. And the plan's recordkeeping fee did not affect you at all in 2025?
A. Again, correct.
Q. And Fidelity's recordkeeping fee for the plan will not affect you at all in the future, correct?
A. Not at all. Correct.
Q. And you were not a participant in the plan until the end of 2021, correct?
A. Sounds right.
Q. And the plan's recordkeeping fee did not affect you at all prior to 2021, correct?
A. Correct.
(Thereupon, Defendant's Exhibit 13 was marked for identification.)
BY MR. CROHAN:
Q. Mr. Mirabal, I'm showing you what's been marked as Exhibit 13. If you see in the bottom right-hand corner, it starts with Mirabal 000001 and the very last page is Mirabal 000127. Do you agree with that?

A. Yes. Correct.
Q. All right. And I'll represent to you that these were documents produced by your counsel to us in this case. My first question is, what did you do to look for -- what did you do to look for documents that were requested of you in this case?
A. What I did was I went online to look at the documents that were available online.
Q. Okay. So these documents that were produced, were all of these found online and then produced, or were these hard copy documents that you had at your home?
A. No, I did not have hard copies.
Q. Did you keep any hard copy documents from the NCR savings plan --
A. No.
Q. If you go to Mirabal 60...
A. Okay.
Q. Is this just a printout that you took from online?
A. I would have to say that this was an online printout because I don't have anything that's a hard copy.
Q. Okay. And at the bottom right-hand corner, below Mirabal 60 it says May 13, 2025?

A. Yes.
Q. And is that when you went online to print this document off?
A. I don't know. It would have -- I mean, I'm looking at the top, it shows that it's online. It's https.
Q. I understand. I'm just trying to understand where this document came from and when you got it.
A. I went online multiple times. I also let my attorney to go online.
Q. All right. And then, if you go to Mirabal 00061, which is the next page, again it shows your account balance is zero?
A. Right.
Q. If you go to Mirabal 66, and if you go about halfway down, it says "Your Account Activity." Do you see that?
A. Yes, I see it.
Q. And the statement period for this is 6/1/2015 to 5/12/2025. Do you see that?
A. I do.
Q. And if you go down under Administrative Fees, what is the total amount of administrative fees that you paid between 6/1/2015

and 5/12/25?
A. I didn't work for them that long, but 39.82.
Q. $39.82, correct?
A. Correct.
Q. So NCR was not charging you a hundred dollars in administrative fees, neither was Fidelity, correct?
A. Okay. Correct.
Q. And did you know that you'd only paid $39.82 in administrative fees prior to filing this lawsuit?
A. I did not know the exact amount, no.
Q. Had you known that, would you have still filed this lawsuit.
A. Based on what I know today, yes.
Q. What is that?
A. That there's a lot of money that could wind up in retirees' accounts that are not winding up in retirees' accounts.
Q. And how is that?
A. Just based on the information that I just read on the Complaint that you handed me, it shows that for every 1 percent that it goes up, 28 percent is actually affecting the retiree.

Q. Show me where you're reading that.
A. Oh, my goodness.
Q. Well, first off, which Complaint are you looking at? Which exhibit are you looking at?
A. The Complaint with Embry-Riddle.
Q. And that's exhibit what?
A. Exhibit 11.
Q. Okay.
A. I would have to go through it again. It's number 6 on page 3.
Q. And that states that the U.S. Department of Labor has noted -- and this is an allegation not in the Complaint at issue in this case, correct?
A. Repeat the question.
Q. This allegation that we're looking at in paragraph 6 --
A. Uh-hmm.
Q. -- that's not in the Complaint that you filed, correct?
A. It's not in my Complaint.
Q. Okay. Do you have any basis to conclude that paragraph 6 in the Embry-Riddle Complaint is accurate?
A. I have no reason to think that it's

not. It would be a waste --
Q. Do you have --
A. It would be a waste of their time to do something of that sort.
Q. To do something of what sort?
A. Where false information is being provided.
Q. Okay. Do you know what fees they are even talking about in paragraph 6?
A. Excessive fees on employee retirement assets. The fees being charged on the retirement assets.
Q. Do you believe that's a claim in this case?
A. I believe that it's occurring. I believe 28 -- that if you go ahead and make a change of, you know, or charge an extra percent, that it's going to affect at the end of the retiree's plan, it's going to affect them by 28 percent.
Q. So you believe that there is a claim in the lawsuit you filed against NCR related to the investment options in this case?
A. I don't even think that this is a claim. I think this is just a statement of fact.

Q. Okay. Do you think that this statement of fact has anything to do with this -- with the NCR case?

A. I think it would be the same thing, their retirement plan. If NCR is charging 1 percent more than they should, it's yearly affecting the employee by 28 percent.

Q. That's what you believe?

A. That's what I believe.

Q. And do you have any basis to believe that?

A. The fact that it's here, it's quoted, and --

Q. It's quoted in what?

A. It's quoted that it's coming from the U.S. Department of Labor.

Q. Okay. So you believe that allegation is correct, correct, in paragraph 6?

A. Absolutely.

Q. So then you also believe in paragraph 96 that $33 is a reasonable recordkeeping fee, correct?

A. Yes, we went through that exactly.

Q. So you believe $33 is a reasonable recordkeeping fee?

A. In page 33, I don't see that here. But you're referring to the --

Q. Page 31.

A. Okay. You're referring to the $33 that is being paid on another Fidelity plan, and like I said, it just depends. I don't know enough about -- you know, I can't compare apples to oranges.

Q. Well, you said that --

A. I could be convinced.

Q. Well, you said that you believed what was in paragraph 6 of this Complaint, correct?

A. Yes.

Q. Okay. Do you believe what's in paragraph 96 of this Complaint?

A. That it's $33? I believe it's $33, yes.

Q. And do you believe that that's a well-managed plan and only charge $33?

A. I don't know that. It just depends again, you know, what the -- what the basis for the $33 are, what they are managing, what they're doing, what they are not doing.

Q. Well, you said you had no reason to doubt what was in paragraph 6. Do you have any

reason to doubt what's in paragraph 96?
A. I have no reason to doubt that it's $33. That's all it states.
Q. No, that's not all it states.
It states that a well-managed plan paid $33 to Fidelity --
A. Right.
Q. -- correct?
A. Right.
Q. Do you have any reason to doubt that that $33 to Fidelity is a reasonable recordkeeping fee?
A. No, I believe it's correct.
Q. Okay.
MR. CROHAN: I don't have any further questions at this time.
MS. HEYSTEK: All right.

CROSS-EXAMINATION

BY MS. HEYSTEK:
Q. Real briefly, Mr. Mirabal, if you were told that you were sitting here at Morgan & Morgan's office because they are a co-counsel in this case, would you dispute that?
A. I wouldn't dispute it.
Q. Okay. Do you recall in your contract

CERTIFICATE OF OATH

STATE OF FLORIDA )
)
COUNTY OF MIAMI-DADE)

I, the undersigned authority, certify that JORGE MIRABAL personally appeared before me and was duly sworn.

WITNESS my hand and official seal this July 24, 2025.

ELENA ROBAINA, FPR
Notary Public-State of Florida

My Commission Expires: 4/17/2028
My Commission #: HH481512

CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
) SS.
COUNTY OF MIAMI-DADE)

I, Elena Robaina, Florida Professional Shorthand Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of JORGE MIRABAL; and that the foregoing transcript, pages 1 through 105, is a true record of my stenographic notes.

I further certify that the said witness was duly sworn according to law.

I further certify that I am not of counsel to either of the parties to set cause or otherwise interested in the action.

In witness whereof, I here unto set my hand and affix my official seal this July 24, 2025.

Elena Robaina
Florida Professional Reporter